UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

UNITED STATES OF AMERICA

v.                                           Case No. 3:18-CR-125 JD

KENNETH SANDERS

## OPINION AND ORDER

Defendant Kenneth Sanders has filed a motion seeking relief under 28 U.S.C. § 2255. (DE 277.) In that motion, Mr. Sanders argues that his previous attorney, Mr. Kurt Earnst, provided ineffective assistance of counsel by failing to notify him of a proffer meeting or to request a proffer meeting with the government. (DE 277-1.) The Court now denies Mr. Sanders' motion, finding that he has not demonstrated that Mr. Earnst's performance was deficient.

### A.    Factual Background

In late October 2018, the Michigan City Police Department and the Bureau of Alcohol, Tobacco, and Firearms had a Confidential Informant ("CI") conduct two controlled buys for methamphetamine. (Presentence Investigation Report ("PSR"), DE 200 ¶ 7.) Both controlled buys followed the same pattern. The CI first called his contact, Ms. Freda Binder. Then, the CI met with Binder and gave her money. After the CI gave Binder the money, officers observed Binder drive into the area of 601 S. Illinois Street in South Bend, Indiana. Binder then left the 601 S. Illinois Street area, at which point she delivered over 100 grams of methamphetamine to the CI (107 grams on the October 23rd buy and 109 grams on the October 29th buy). (*Id.*)

In the first week of November 2018, two further buys were set up using the CI and undercover officers. (*Id.* ¶¶ 9–10.) One of the buys took place on November 1st, while the other took place on November 5th. These two buys had a similar pattern to the first two: the CI or an

undercover officer called Binder, Binder met the undercover officer who paid her in cash, then Binder went back to the 601 S. Illinois area. (*Id.*) For these buys, officers now observed an individual come out of the house at 601 S. Illinois and get into Binder's car. The individual then got out of the car, went back into 601 S. Illinois, and brought back a package. (*Id.*) After the package was given to Binder, Binder then delivered the package to the undercover officer, which contained over 100 grams of meth (110 grams of meth on the November 1st controlled buy and 111 grams of meth on the November 5th controlled buy). (*Id.*)

On November 5, 2018, officers executed a search warrant on 601 S. Illinois Street. Inside, the officers found over four pounds of methamphetamine, eighty-seven grams of heroin, as well as scales and baggies. (*Id.* ¶¶ 12–15.) The officers also found Maurice Sylvester and Kenneth Sanders. (*Id.*)

On November 15, 2018, a grand jury indicted Mr. Sanders on multiple charges, including a conspiracy to distribute meth and heroin. (DE 17.) After a superseding indictment was filed (DE 82), Mr. Sanders pled guilty to a conspiracy to distribute over 500 grams of a mixture or substance containing methamphetamine and over 100 grams of a mixture or substance containing heroin in violation of 21 U.S.C. § 846. (DE 170; DE 183.) This offense carried a mandatory minimum term of imprisonment of 10 years. 21 U.S.C. § 841(b)(1)(A). At his sentencing, the Court addressed whether 18 U.S.C. § 3553(f), commonly known as the "safety valve", allowed the Court to sentence Mr. Sanders below the 10-year mandatory minimum. "Under the safety-valve provision, a court can sentence a defendant below the statutory minimum sentence accompanying certain drug-related offenses if the defendant meets five criteria: (1) his criminal history is minimal; (2) he did not use or threaten violence or possess a firearm in connection with his offense; (3) the offense did not result in death to any person; (4) he was not an organizer or

leader in the offense; and (5) he truthfully provided all information and evidence about the offense to the government before his sentencing hearing." *U.S. v. Stamps*, 983 F.3d 945, 949 (7th Cir. 2020); 18 U.S.C. § 3553(f); U.S.S.G. § 5C1.2. At Mr. Sanders' sentencing hearing, the Court noted that the fifth element excluded Mr. Sanders from "qualification for the safety valve because he ha[d] not cooperated and provided information about his crime." (DE 263 at 6:8–12.) Both the Government and the Defendant, through his attorney at the time, Mr. Kurt Earnst, agreed that the safety valve did not apply owing to Mr. Sanders' lack of cooperation. (*Id.* at 6:16–19.)

On November 20, 2020, Mr. Sanders filed a motion to vacate this sentence under 28 U.S.C. § 2255. (DE 277.) This motion argues that Mr. Sanders did not receive effective assistance of counsel from Mr. Earnst. (*Id.* at 5.) Mr. Sanders asserts that Mr. Earnst's performance was deficient because Mr. Earnst failed "to notify him of a proffer meeting or proper opportunity to satisfy the 'safety valve.'" (*Id.*) According to Mr. Sanders, this resulted in prejudice because he was willing to cooperate and, if he had been given the opportunity, he would have cooperated and satisfied the fifth element of the safety valve. This would have enabled him to receive a sentence below the 10-year minimum sentence.

Following further briefing from the parties, the Court conducted an evidentiary hearing. (DE 311; DE 313.) During this hearing, the Court heard from both Mr. Sanders as well as Mr. Earnst, who provided competing accounts of Mr. Earnst's representation. (DE 311; DE 312.) In line with his motion, Mr. Sanders testified that Mr. Earnst failed to advise him about any of the elements of the "safety valve" during their meetings and advised him that in order to qualify for the safety valve he would have to give the Government "something big[.]" (DE 315 at 89:2–17, 92:18-24, 95:3–13.) However, Mr. Earnst provided a different account of the events. According

to Mr. Earnst, he discussed the safety valve with Mr. Sanders, read the statute to him verbatim, and explained to him that "as long as he is truthful and continues to be truthful" he would meet the fifth requirement. (DE 315 at 21:16–23; DE 316 at 12:7–13:10.) However, according to Mr. Earnst, at no point did Mr. Sanders indicate he wanted to cooperate. (DE 316 at 13:7-10.)

With the evidentiary hearing now complete, the Court now considers Mr. Sanders' motion.

## B.      Standard of Review

Section 2255(a) of Title 28 provides that a federal prisoner "claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States . . . may move the court which imposed the sentence to vacate, set aside or correct the sentence." 28 U.S.C. § 2255(a). The Seventh Circuit has recognized that § 2255 relief is appropriate only for "an error of law that is jurisdictional, constitutional, or constitutes a fundamental defect which inherently results in a complete miscarriage of justice." *Harris v. United States*, 366 F.3d 593, 594 (7th Cir. 2004). Relief under § 2255 is extraordinary because it seeks to reopen the criminal process to a person who has already had an opportunity of full process. *Almonacid v. United States*, 476 F.3d 518, 521 (7th Cir. 2007) (citing *Kafo v. United States*, 467 F.3d 1063, 1068 (7th Cir. 2006)).

## C.      Discussion

Mr. Sanders argues that he received ineffective assistance of counsel at sentencing from his prior attorney, Mr. Kurt Earnst. The Sixth Amendment provides a criminal defendant with the right to counsel, U.S. Const. amend. VI, and "inherent in this right is that the defendant is entitled to the effective assistance of counsel." *United States v. Recendiz*, 557 F.3d 511, 531 (7th Cir. 2009) (citation omitted). In order to prevail on his claim for ineffective assistance of

counsel, Mr. Sanders must establish (1) that his counsel's performance was deficient and (2) that the deficient performance prejudiced the defense. *See Koons v. United States*, 639 F.3d 348, 351 (7th Cir. 2011) (quoting *Strickland v. Washington*, 466 U.S. 668, 687 (1984)).

The first prong of the *Strickland* analysis requires that the Court determine if counsel acted "outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. "The question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom." *Koons*, 639 F.3d at 351 (citing *Sussman v. Jenkins*, 636 F.3d 329, 349 (7th Cir. 2011)). Furthermore, the Court "maintain[s] a strong presumption that the defendant received effective assistance," *Hardamon v. United States*, 319 F.3d 943, 948 (7th Cir. 2003), and that the challenged conduct "might be considered a sound trial strategy." *Strickland*, 466 U.S. at 689 (citation and quotation omitted).

The second prong of the *Strickland* analysis requires that there be a "reasonable probability that, but for the ineffective assistance, the result of the proceedings would have been different." *Recendiz*, 557 F.3d at 531. A "reasonable probability" that the result would have been different is a probability "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

The Court finds that Mr. Sanders has failed to establish that Mr. Earnst's performance was deficient. In coming to this conclusion, the Court credits Mr. Earnst's testimony over Mr. Sanders' testimony. Mr. Earnst has consistently stuck to the same version of events: that he discussed the safety valve with Mr. Sanders, including the cooperation provision, but that Mr. Sanders was just not interested in cooperating. He first indicated as such in his affidavit, stating that he "explained [to Mr. Sanders] the safety valve provisions . . . that would allow him to be

sentenced below the 10-year mandatory minimum sentence . . . and that Mr. Sanders would need to cooperate with the government and give a complete truthful statement as to the facts of this offense." (DE 286-2 at 2.) Mr. Earnst then states in the affidavit that Mr. Sanders "told me he understood the safety valve elements, but was not willing to sit down and talk with the government or to give the facts as to his involvement." (*Id.*)

Mr. Earnst's testimony at the evidentiary hearing was consistent with this affidavit. In that testimony, he stated that he approached Mr. Sanders multiple times about cooperating. (DE 316 at 12:7–15.) According to Mr. Earnst, he approached Mr. Sanders about cooperating each time the Government brought it up. (*Id.*) During these meetings, Mr. Earnst testified that he explained the general parameters of the safety valve and then read the applicable section of the safety valve regarding cooperation "verbatim." (DE 315 at 13:1–14:5; DE 316 at 12:16-22.) While Mr. Earnst was not able to say the exact number of times he discussed the safety valve with Mr. Sanders, or give the exact dates, Mr. Earnst indicated that he discussed it "multiple times" with Mr. Sanders. (DE 315 at 11:2–25, 15:18–21.) Despite these repeated discussions, according to Mr. Earnst's testimony, Mr. Sanders consistently expressed to Mr. Earnst that he had no interest in cooperating with the government. (*Id.* at 11:19–25, 33:18–21, 36:14–19, 37:15–25.)

That Mr. Sanders knew about the importance of cooperating, but had no desire to do so, is also supported by other portions of the record. Mr. Sanders' first counsel, Mr. Rodolfo Monterrosa, states in an affidavit that when he met Mr. Sanders on January 21, 2019, Sanders indicated that "he was not willing to cooperate with the Government." (DE 286-1 ¶ 6.) Mr. Monterrosa further states that Mr. Sanders reiterated this point during a second discussion on

March 27, 2019. According to Mr. Monterrosa, during that discussion, "Mr. Sanders was adamant with me he did not want to talk with or cooperate with the government."[1] (*Id.* ¶ 7.)

Other aspects of the record, written by Mr. Sanders himself, help corroborate Mr. Earnst's and Mr. Monterrosa's version of events. Mr. Sanders previously sent a letter to this Court which was consistent with his refusal to cooperate with the government. In Mr. Sanders' letter asking the Court to terminate Mr. Monterrosa's appointment and appoint new counsel, Mr. Sanders stated that Mr. Monterrosa "asked if I would cooperate with [the] government which I told him there was nothing to tell that I was knowledgeable of." (DE 139 at 2.) Mr. Sanders' admission that he refused to cooperate in the past suggests that his former counsel did, in fact, discuss cooperation with him, but that Mr. Sanders did not want to cooperate.

Further corroborating Mr. Earnst's version of events is the Court's discussion of the safety valve at Mr. Sanders' sentencing. (DE 263 at 5:24–6:14.) The Court specifically advised Mr. Sanders that he did not qualify for the safety valve "because he ha[d] not cooperated and provided information about his crime." (*Id.*) During his sentencing, Mr. Sanders also was asked about the presentence report and stated that he reviewed the presentence report and discussed it with Mr. Earnst. (*Id.* at 5:7–13.) The Court also gave Mr. Sanders an opportunity to "address the Court" and asked him if there was "anything [he] want[ed] to say?" (*Id.* at 10:19–21.) During the entirety of the hearing, despite being given multiple opportunities to speak up, and being advised that the safety valve would not apply, Mr. Sanders did not raise any issues concerning the safety valve to the Court. Had Mr. Sanders truly been concerned about his counsel's performance, or

---

[1] Both of the affidavits from Mr. Monterrosa and Mr. Earnst were admitted into evidence, without objection, as Defendant's Exhibit 27 and 28. (DE 315 at 5:3–8.) Additionally, the Court notes that both of the affidavits are deemed reliable. Both affidavits were consistent with Mr. Earnst's testimony and both attorneys made their respective statements under oath.

thought that he had not received information concerning the safety valve, it seems likely he would have raised the matter to the Court when the safety valve was brought up at sentencing. At the evidentiary hearing, Mr. Sanders testified that he had previously been informed by other inmates that he qualified for the safety valve and that Mr. Sanders believed he qualified for the safety valve. (DE 315 at 52:2–53:8.) If Mr. Sanders was telling the truth concerning Mr. Earnst's failure to discuss the safety valve and his belief (prior to sentencing) that he qualified for the safety valve, then this is all the more reason that Mr. Sanders would have brought up the safety valve at his sentencing hearing. After all, if an individual has prior doubts about something, and then is given multiple chances to raise those doubts, then it is likely for that individual to raise them. However, Mr. Sanders failed to raise the issue, which tends to support that Mr. Earnst did advise him of the safety valve and that, after being advised, he no longer believed he qualified for the safety valve.

The above evidence supports that Mr. Sanders knew about the cooperation requirement of the safety valve, but still did not want to cooperate. However, Mr. Sanders's testimony at the evidentiary hearing contradicts much of the above. At his hearing, Mr. Sanders testified that Mr. Monterrosa and Mr. Earnst both advised him that fulfilling the cooperation element of the safety valve required something more than all the information at his disposal concerning his own offense. According to Mr. Sanders, he was advised "the Government wanted a big fish, somebody bigger than me." (DE 315 at 88:14-17, 92:18-24.) Mr. Sanders testified that neither attorney indicated that, in order to meet the cooperation element of the safety valve, he only needed to sit down with the government, give a statement regarding his involvement, and provide all information he had concerning the offense. (DE 315 at 89:2–17, 95:3–13.) In fact, Mr. Sanders testified that in 10 to 11 meetings, Mr. Earnst never discussed the elements of the

safety valve. (*Id.* at 89:14–17.) Finally, Mr. Sanders indicated that Mr. Earnst advised him that if he sought the safety valve, then the Government would seek enhancements in retaliation.[2] (*Id.* at 57:14–23.)

The Court gives Mr. Sanders' testimony little weight because it is internally inconsistent, implausible, and that Mr. Sanders had a clear motive to lie: to seek a reduction of his sentence. The Court notes that it is unlikely that Mr. Earnst would discuss the government retaliating against Mr. Sanders for invoking the safety valve if there was no prior discussion of what the safety valve was or what its requirements were. This is because one does not typically discuss the consequences of invoking a statute without first discussing the statute itself. In other words, one does not typically say you shouldn't argue *x* without first explaining what it means to argue *x*. Therefore, Mr. Sanders statement that (1) Mr. Earnst met with him 10 or 11 times but failed to discuss the elements and (2) that Mr. Earnst warned him about retaliation are in some tension with one another.

The Court also notes that Mr. Sanders' assertion that Mr. Earnst failed to advise him of the cooperation element is contradicted, at least in part, by a letter that Mr. Earnst sent to Mr. Sanders on January 8, 2020. (Evidentiary Hearing, Ex. 17, DE 311.) There, Mr. Earnst wrote the following:

> I also wish to give you my preliminary thoughts as to the possibility of "safety valve" pertaining to your case. I have looked at the expansion of the safety valve under the "First Step Act." That act does indeed expand what can be considered for safety valve. However, one area that you may have an issue with is a requirement that you would be "deemed to have been providing the Government with all information at your disposal." This may be an issue the Government may use by way of an objection. I am still looking at this further and I wanted to give you my preliminary thoughts. I have also approached Probation about the possibility of

---

[2] Mr. Earnst denied that he told Mr. Sanders that the Government had threatened to seek enhancements against him. (DE 316 at 36:13–16.) The Court finds this testimony more credible than Mr. Sanders' testimony for the same reasons it credits Mr. Earnst's other testimony in this order.

such an application of safety valve and am waiting [on] an answer. As you can imagine, the Government is not inclined to agree.

(*Id.*) In this letter, Mr. Earnst does not indicate that Mr. Sanders has to give up a "big fish," as Mr. Sanders testified. Rather, the letter explicitly indicates that Mr. Earnst provided a definition of cooperation that, while not identical, was in line with the statute's text. *See* 18 U.S.C. § 3553(f)(5) (in order to receive safety valve, "the defendant [must] truthfully provide[] to the Government all information and evidence the defendant has concerning the offense or offenses that were part of the same course of conduct or of a common scheme . . ."). Furthermore, the final line of Mr. Earnst's letter, which reads, "[a]s you can imagine, the Government is not inclined to agree," tends to support that Mr. Earnst had discussed the safety valve with Mr. Sanders previously. Accordingly, this letter is more consistent with Mr. Earnst's testimony than Mr. Sanders' testimony.

Mr. Sanders's testimony also appears implausible given the background of the attorneys and other evidence in the record. Both Mr. Earnst and Mr. Monterrosa are experienced criminal defense attorneys. Mr. Monterrosa has been representing criminal defendants in federal court since 2002 (DE 286-1) and Mr. Earnst has been representing federal criminal clients since 2001. (DE 286-2.) Due to their experience, and their statements to the contrary, it is unlikely that both Mr. Earnst and Mr. Monterrosa independently advised Mr. Sanders that he needed to give up a "big fish." Nor can it be said that, given their experience, they were unfamiliar with the elements of the safety valve.

Finally, the Court notes that the persuasiveness of Mr. Sanders' testimony is diminished by his clear motive to lie. *House v. Bell*, 547 U.S. 518, 552 (2006) (noting that statements from those with a motive to lie have less probative value than a statement from an individual with "no evident motive to lie"). Here, Mr. Sanders has an interest in reducing his sentence. If Mr. Earnst

had provided the constitutionally deficient counsel which Mr. Sanders asserts he did, Mr.

Sanders would likely be eligible for a reduced sentence. Therefore, Mr. Sanders had an obvious

motive to downplay the counsel Mr. Earnst provided him in his case: namely, to get a sentence

shorter than the one currently imposed.

Given that Mr. Monterrosa's and Mr. Earnst's accounts are consistent with one another

and supported by much of the record, while Mr. Sanders' had a motive to lie and that his

testimony appears to be inconsistent with the record and implausible, the Court finds that Mr.

Earnst approached Mr. Sanders regarding cooperation and advised Mr. Sanders that he had to

cooperate with the government in order to be eligible for the safety valve, in line with the text of

18 U.S.C. § 3553(f)(5). However, even though Mr. Earnst advised Mr. Sanders of the elements

of the safety valve and what cooperation entailed, Mr. Sanders still did not wish to cooperate.

Mr. Sanders' motion is based on the allegation that Mr. Earnst's performance was

deficient for failing to "notify him [of] a proffer meeting or proper opportunity" to satisfy the

safety valve. (DE 277 at 5.) The finding that Mr. Earnst *did* notify Mr. Sanders regarding

cooperation, provided an explanation of the requirement in line with the statute's text, but that

Mr. Sanders simply did not want to cooperate, warrants denial of Mr. Sanders' motion. Pursuant

to those factual findings, it is clear that Mr. Earnst's performance was within the "wide range of

professionally competent assistance." *Strickland*, 466 U.S. at 690. Furthermore, Mr. Earnst's

failure to argue the safety valve at sentencing did not constitute ineffective assistance. The

Seventh Circuit has consistently held that counsel need not argue for the applicability of the

safety valve when a defendant fails to meet all five criteria. *See, e.g.*, *United States v.*

*Quintanilla,* No. 02–4279, 2003 WL 22977483, at *2 (7th Cir. Dec. 17, 2003) (finding it would

have been frivolous to argue that the safety valve provision applied where the defendant had

three criminal history points); *United States v. Herrera–Ruiz*, No. 00–1340, 2000 WL 973622, at *1 (7th Cir. June 13, 2000) (finding it frivolous to appeal an argument that counsel was ineffective for not arguing the defendant was entitled to safety valve reduction where the defendant conceded he did not meet the fifth criteria). Accordingly, once it became clear that Mr. Sanders could not meet the safety valve due to his desire not to cooperate, it was reasonable for Mr. Earnst to stop advancing that argument.  Since the Court's finding regarding Mr. Earnst's performance is dispositive, the Court does not examine prejudice. *Gargano v. United States*, 852 F.2d 886, 891 (7th Cir. 1988) (noting that a failure to show either deficient performance *or* prejudice causes an ineffective assistance of counsel claim to fail).

The Court also declines to issue a certificate of appealability. A certificate of appealability may be issued "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); Rule 11, Rules Governing Section 2255 Proceedings for the United States District Courts. The substantial showing standard is met when "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)); *see Young v. United States*, 523 F.3d 717 (7th Cir. 2008). For the reasons the Court already discussed in denying the motion, the Court does not believe that the resolution of this motion is debatable or that the issues deserve encouragement to proceed further.

The Court advises Mr. Sanders, though, that pursuant to Rule 22(b) of the Federal Rules of Appellate Procedure, when the district judge denies a certificate of appealability, the applicant may request a circuit judge to issue the certificate. If Mr. Sanders wishes to appeal this judgment,

a notice of appeal must be filed within 60 days after the judgment is entered. Rule 11, Rules

Governing Section 2255 Proceedings for the United States District Courts; Fed. R. App. P. 4(a);

*Guyton v. United States*, 453 F.3d 425, 427 (7th Cir. 2006).

**D.    Conclusion**

The Court DENIES Mr. Sanders' motion under § 2255. (DE 277.) The Court also

DENIES the issuance of a certificate of appealability. The Clerk is DIRECTED to enter

judgment accordingly.

SO ORDERED.

ENTERED: November 1, 2022

> _____/s/ JON E. DEGUILIO_____
> Chief Judge
> United States District Court